UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| TRAVIS PERRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:20-cv-00301-LEW |
| | ) |
| THE HANOVER INSURANCE | ) |
| GROUP, INC., a/k/a HANOVER | ) |
| INSURANCE COMPANY | ) |
| | ) |
| Defendant. | ) |

**DECISION AND ORDER**

On August 22, 2019, fire destroyed the engine room, v-berth, deck and wheel house of the fishing vessel *ISLA & GRAYSON* as it stood on jackstands during a short haul for maintenance and repairs. Travis Perry, owner of the vessel, filed a claim with the Hanover Insurance Group, Inc. ("Hanover"), insurer of the vessel, seeking coverage for his loss. Following an investigation, Hanover denied the claim, contending that Perry intentionally set fire to the *ISLA & GRAYSON*. In August of 2020, Perry filed suit against Hanover to recover under the policy. The matter comes within this Court's admiralty jurisdiction and therefore proceeded to a bench trial rather than a jury trial, as it might have in an action arising under Maine law.[1]

After carefully considering the testimony, exhibits, stipulations, and arguments presented by the parties, I announce in this Decision and Order my findings of fact and

---

[1] The federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction," 28 U.S.C. § 1333(1), which category "unquestionabl[y]" includes cases involving marine insurance, *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir. 1995).

conclusions of law. Based on the findings of fact and conclusions of law, judgment will enter in favor of Plaintiff on Plaintiff's core claim for breach of contract and declaratory judgment to that effect, but in favor of Defendant on Plaintiff's contention that Defendant failed to act in good faith during the claim-handling process. Additionally, Plaintiff's Motion to Exclude Certain Opinion Testimony of J.P. Williamson (ECF No. 51) is denied as moot.

## FINDINGS OF FACT

Travis Perry is a lobster fisherman and 25-year resident of Columbia Falls, where he lives with his domestic partner, Dara Knapp, and their children. Roughly since graduating high school Perry has captained his own fishing vessels, sailing from his father's wharf in Harrington. Over his fishing career Perry has owned a number of lobster boats, most notably the *RATTLESNAKE*, the *ISLA & GRAYSON* (named for his children), and the *ISLA & GRAYSON II*. This litigation concerns the *ISLA & GRAYSON*.

Perry commissioned construction of the *ISLA & GRAYSON* in 2017, financing the purchase with a combination of a $500,000 business loan and roughly $475,000 of his own funds. Although the *ISLA & GRAYSON*'s hull was not uncommon, designed and supplied by H&H Marine of Steuben, Perry had his builder, Mike Light, install a recent vintage, 12-valve Baudouin diesel engine that Perry purchased through Kennedy Marine Engineering of Steuben. On Perry's request, Light installed an additional lobster tank on the boat, which caused the engine to be moved forward from where it might otherwise have gone in the boat. Light also installed the vessel's hydraulics system.

Hanover Insurance Company issued to Perry, as the named insured, a marine

insurance policy, in effect from September 5, 2018, to September 5, 2019, and identifying the *F/V ISLA & GRAYSON* as the insured vessel ("the Policy"). Joint Stipulations of Fact for Trial in this Matter ¶ 3 (ECF No. 87). The Policy covered losses stemming from "the adventures and perils . . . of the waters named herein, fire, lightning, earthquake, assailing thieves, jettisons, barratry of the master and mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel named herein." *Id.* ¶ 4; Ex. 41 at 2; *see also* Compl. Ex. 1 at 2 (ECF No. 1-1).

Perry's early experiences with the *ISLA & GRAYSON* were not smooth sailing. On the vessel's maiden voyage, with members of the Perry family aboard, the seal in the vessel's steering pump failed and approximately 30 gallons of hydraulic oil spilled, seeped into the engine, and flooded the engine room floor. After cleaning the mess and hauling the vessel for repair and redesign of the hydraulic system over a course of several weeks, Perry began fishing with the *ISLA & GRAYSON* in October of 2017.

More difficulties followed. The electrical system's low voltage alarm persistently sounded in the morning as the engine warmed, emitting a loud, high-pitched noise. A mechanic flown up from Motor Services of Florida (on a warranty basis) could not resolve the issue, and ultimately Perry decided to disable the alarm. The engine also emitted enough smoke during operation to foul the air and discolor the ceiling in the engine room. The Motor Services mechanic addressed the smoking issue by adjusting the fuel map, but then the engine could not attain its advertised speed. Shortly thereafter, the mechanic replaced the engine's turbo chargers. The mechanic also changed twelve injectors, two fuel pumps, six check valves, and one fuel rail. Even after this work, the engine still leaked oil

and exhaust. The engine's belt-driven trunnion also slipped or threw off its belt on a recurring basis. Kennedy Marine Engineering repaired the trunnion problem, but not without degrading the engine room gel coat with burns from hot, metal grinder filings. Miscellaneous service calls, including warranty calls, continued into 2019.

Eventually, the *ISLA & GRAYSON*'s mechanical problems were resolved, but not before causing Perry significant frustration. Perry had commissioned what he thought would be a showcase fishing vessel. What he wound up with fell short of his expectations and delivered a series of headaches that understandably angered and embarrassed him, as Hanover contends. Perry would at times deride the *ISLA & GRAYSON* in text messages to a friendly fellow fisherman. In one March 2018 text exchange Perry called the vessel "junk" and joked he would "burn [h]er in the morning." Ex. 39 at 32. In an April 2018 text exchange he suggested he might intentionally ground the vessel "then jump out and throw a match inside." *Id.* at 34. Asked why, he said he would have to call since there was "too much to explain." *Id.*

Around the same time as this text exchange, Perry took a cruise on the same friend's vessel, a recent acquisition with a Wesmac hull and a V-12 engine. The vessel's performance impressed Perry so much that he "went and ordered one" to replace the *ISLA & GRAYSON*. Tr. 103. The new boat, which Perry was set to christen the *ISLA & GRAYSON II*, was roughly a third cheaper than the original *ISLA & GRAYSON*.

Perry listed the *ISLA & GRAYSON* for sale with Athearn Marine. Though Perry received little interest in the boat and found no realistic possibility of a sale, the listing was no fire sale. Perry initially listed the boat for $850,000—$100,000 less than he paid for it—

and the listing only went as low as $700,000.

In April of 2018, Perry had another text exchange in which he complained of the *ISLA & GRAYSON* sailing at only 24 knots. His friend observed that at least "she's still running," and Perry replied, "Yup who knows how fucking long." *Id.* at 35. In June, Perry's friend suggested he follow the example of a local salt and burn his boat for the insurance money, to which Perry replied that the other man had "a 150k boat not 850." *Id.* at 36. When advised, "just gotta do it," Perry responded, "go ahead I'm gone for 3 days." *Id.* at 37.

Throughout this stormy period, Perry remained financially afloat. Perry had sunk a lot of money into the *ISLA & GRAYSON*, financed in part with a loan, and had taken out an additional loan to secure the *ISLA & GRAYSON II*, garnering a substantial debt to service. But Perry consistently had sufficient revenue from lobstering to meet his obligations and still have significant net income. Perry also had sufficient funds to plan for the launch of a new bait business in 2019, and even took on an additional (albeit more modest) business loan to finance this new endeavor. Certainly, Perry had taken on a good deal of water, including a backlog of various machines and accoutrements of his trade, but there was no reason to think he was close to swamping, so long as he could keep fishing. Relying primarily on the *ISLA & GRAYSON*, but also the *RATTLESNAKE* (his preceding vessel) and boats lent by other fishermen, Perry made it through the 2017-2018 and 2018-2019 fishing season in good shape. For example, Perry's 2018 tax return reports gross profit over $600,000. Even after the deduction of other expenses, Perry realized

considerable net income in 2018.[2]

On August 20, 2019, more than a year after his unfortunate text exchanges about burning his lobster boat, Perry hauled the *ISLA & GRAYSON* for maintenance. For the next couple of days, the boat remained on jackstands at Perry's father's boat yard on His Cove Lane in Harrington. On August 21, local boatbuilder Moises Ortiz, who was at the time constructing the *ISLA & GRAYSON II* for Perry, came to the Perry boat yard to perform fiberglass repairs on the *ISLA & GRAYSON*'s shaft tube. A vessel's fiberglass hull and shaft tube must be bonded together, but the *ISLA & GRAYSON*'s bonding work had cracked and come loose where the shaft tube passed through the hull. Ortiz ground down the fiberglass hull, exposing not only the shaft tube but also a questionable wooden wedge or shim used during the vessel's construction, which he removed and replaced with fiberglass material. He then rebonded the hull to the shaft tube with fiberglass. This work took between four and five hours.

Later that day, Ortiz went with Perry into the engine room to take measurements for purposes of planning for the electrical layout of the *ISLA & GRAYSON II*'s engine room. While there, Perry joined him and consulted with him concerning some fiberglass stress cracks in support structures associated with the engine bed on the original *ISLA & GRAYSON* that warranted repairs. One of the needed repairs was at the junction of a stringer and baffle adjacent to and immediately aft of the forward engine mount on the starboard side, a location in close proximity to the vessel's fuel and oil filters. Ortiz noted

---

[2] Perry's net profit for tax purposes was a paltry number, but only thanks to depreciation in the amount of $340,169.

that, although a repair was called for in this location and the crack would worsen with time if left unaddressed, the crack did not present an immediate hazard. Had Ortiz taken on the job, he would have performed the repairs with a rather intensive amount of grinding so that he could reinforce the area with fiberglass matting to ensure the longevity of his repairs. However, Ortiz was unwilling to take the time to do the job the way he would want to do it and had little interest in performing additional repairs to a boat built by someone else. Instead, Ortiz provided Perry with the tools that he needed to perform his own repair, including a grinder, fiberglass cloth, a gallon and a half of resin, and a gallon jug containing hardener.

In the location of the starboard side stress crack, the engine room floor steps up where a horizontal baffle attaches to the starboard longitudinal stringer. Because of this step up, the floor is level with the top of the forward engine mount and, therefore, access to the engine mount and bolts is provided by a narrow slot cut in the floor alongside the mount. Because the slot provides a narrow opening in the engine room floor, and because the longitudinal stringers and horizontal baffles hug the hull along their bottom edges, a small reservoir is formed that is capable of collecting water, oil, diesel fuel, rags, and other fluids or debris. There is no ready way to access this reservoir for cleaning purposes, since the floor panel is fiberglassed to the hull and the slot adjacent to the mounting plate is narrow. Although Perry was inclined to keep a tidy ship, I credit his testimony that engine oil and diesel fuel had spilled into this general area on several occasions, including from the vessel's Racor and oil filters, and that he used the reservoir at times to hold rags used to wipe up such spills.

On the morning of August 22, 2019, the day after Ortiz was at the boat yard, Perry and his sternman, Cody Lesbines, met at the boat yard to perform an oil change and the fiberglass repairs at the location of the stress cracks. The oil change was the first order of business and they pumped out the old oil without incident before turning to the fiberglass work. After performing some grinding and fiberglass work on the stress cracks, Perry left the boat yard with his father to purchase gelcoat in Gouldsboro, about a half hour away from the boat yard. As revealed by photographic evidence introduced by Hanover, Perry's repair work was cosmetic at best—he had not performed the level of grinding that Ortiz suggested and had done little more than cover over the cracks. This uninspired workmanship appears out of keeping with Perry's general fastidiousness; thus to Hanover, Perry's poor handiwork evinced an intent to burn the boat. After considering testimony by various witnesses, I find the more likely explanation to be that Perry put in comparatively little effort due to a strong aversion to grinding fiberglass and a hope that he would soon sell the afflicted boat regardless.

When Perry left the vessel, Lesbines remained on board to clean up after the morning's repairs. Sometime later, Lesbines climbed down from the boat and was observed by others walking through a lunch room, using a wash up station, and taking a smoke break. Shortly thereafter—while Lesbines remained off the boat—a steady stream of thick, black smoke began rising from the lower deck, up through the v-berth and into the wheel house of the *ISLA & GRAYSON*. Lesbines and another local fisherman looked to see if there was anything they could do, but the smoke and flames were too intense and too difficult to access (being below deck) for them to have any prospect of suppressing the fire. Before

long, the fire was raging so severely inside the vessel that it would have been extremely reckless for anyone to board it.[3] Perry, who sped back to the yard with his father when informed of the fire, arrived after local volunteer firefighters. At first, Perry could do nothing more than watch in dismay, but eventually he and another observer used forklifts to dump crateloads of water on the burning boat after the worst of the burning had subsided. The fire continued for several hours and in that time Perry contacted his local insurance agent to notify him of the incident.

Upon receiving notice of the fire from Perry, Hanover began an investigation. Fire investigator Jason Hillman arrived on scene while the fire was still burning and recorded statements from witnesses. Over the ensuing months, Hillman, along with investigators J.P. Williamson and Sean Sullivan, continued to look into the origins of the fire on the *ISLA & GRAYSON* by inspecting the damaged vessel and interviewing key parties. Though Hanover and its investigators quickly adopted a critical stance toward the fire's cause, they do not appear to have engaged in motivated reasoning or otherwise breached the professional norms of fire investigation. The vessel inspection proceeded on various dates and generally consisted of excavating debris out of the hull and inspecting the debris for signs of the fire's cause and origin. During this investigation, Hanover found that the aforementioned reservoir near the starboard side of the engine room contained several pieces of debris such as cloth rags, along with a solidified mass of resin containing red dye (in the hue used to dye marine diesel fuel) and traces of petroleum products. Noting that

---

[3] Another local fisherman who uses the Perry wharf was first to spot the fire. He did climb onto the deck to determine if anyone was aboard, but wisely did not descend to the engine room through the rising smoke and instead hastily retreated to sound the alarm.

the mass of resin does not appear in photographs of that location taken by Moises Ortiz the day before the fire, Hanover theorized that the resin and diesel fuel were poured into the hull in an effort to catalyze or fuel a fire.[4] Based on the results of this investigation, the investigators concluded that the fire not only started in the reservoir near the starboard side of the engine room, but was intentionally set by Perry and/or Lesbines. As a result, Hanover declined Perry's claim to recover for the loss of the *ISLA & GRAYSON*.

This litigation ensued. Of note, during the litigation, Coby Lesbines, the last person on board the *ISLA & GRAYSON* before it burned, appeared at his deposition but repeatedly invoked the Fifth Amendment privilege against self-incrimination on the advice of counsel.[5] Shortly thereafter, Hanover filed a third-party complaint against Lesbines in which it alleged he had conspired with Perry to defraud Hanover by intentionally burning the *ISLA & GRAYSON*, though Hanover ultimately dismissed its complaint against Lesbines voluntarily. In an order issued shortly before trial, I granted Hanover's motion in limine requesting that I rule that Lesbines's refusal to testify would permit me to draw an adverse inference against Perry. Order on Motions in Limine (ECF No. 97). Although I granted the motion in limine, I did not draw the inference at that time but waited to see what the evidence would show. During trial, video evidence recorded by a former Perry employee depicts Lesbines pacing back and forth during the fire. Lesbines's demeanor and limited vocalization suggested to me what one might expect of someone anxious to think

---

[4] Persons accustomed to working with fiberglass understand that resin is flammable and that the hardener, if mixed at too high a ratio, can produce spontaneous combustion. However, when tested in the lab, the puddle of solidified resin collected from the reservoir did not contain an excessive ratio of hardener.

[5] In contrast with his deposition performance, Coby Lesbines participated in interviews with Hanover's investigators, including on the day of the fire.

10

that he might somehow be responsible for a destructive fire, but it did not suggest to me that he had intentionally set fire to the vessel. I cannot now rule out the remote possibility that Lesbines intentionally set fire to Perry's vessel. But I cannot fathom what he would have expected to gain from such an act or why he would be so beholden to Perry to engage in a criminal act even if it was requested of him. Thus while Lesbines' invocation of his right against self-incrimination supports an inference of culpability against Perry, that inference is overcome by contrary evidence.

Based on the evidence presented at trial, I find that it is possible and perhaps likely that the fire did start in the vicinity of the forward, starboard engine-mount. The starboard side of the engine along with the starboard area near the filters and fuel lines does appear to have burned with the greatest intensity. That area also seems to be a good cause and origin candidate given the history of fuel and oil spills in that very vicinity. Yet, despite the intense heat and flame, the mass of resin removed from the mounting slot reservoir did not burn. It also appears possible that the unexplained mass of resin in the hull might have been left over from that day's repairs or added to tack down nearby baffles during the original boat construction process, and that its presence in the reservoir was due to the resin running and pooling in the low area as a result of heat generated by the fire. As for the diesel contamination with its telltale red colorant, this could well have come from a spill or leak from the nearby fuel line during the fire. In the end, I cannot say to a probability what caused the fire.

Perry, for his part, adamantly denied an intent to destroy his vessel. Similarly, his domestic partner, Dara Knapp, testified that Perry did not have any financial need to

destroy the vessel and that he did not have anything to do with the fire. Ultimately, they were credible witnesses. Based on their testimony, I find that Perry, although frustrated with the difficulties that he experienced with the *ISLA & GRAYSON* and eager to replace the vessel with the *ISLA & GRAYSON II*, did not intentionally set fire to the *ISLA & GRAYSON* or request that Lesbines set fire to it for him. Given these findings, I conclude as a matter of law, for reasons discussed below, that judgment must enter in part for Perry and against Hanover. However, I also find that Hanover conducted a reasonable, good faith investigation and treated Perry fairly during the process.

## CONCLUSIONS OF LAW

"Generally, in cases involving a marine insurance contract, [federal courts] will apply state law unless an established maritime rule controls the disputed issue, and that rule is materially different from state law." *Com. Union Ins. Co. v. Pesante*, 459 F.3d 34, 37 (1st Cir. 2006) (cleaned up). Here, Maine law and federal maritime law largely overlap. Regardless of which law applies, Perry bears the initial burden of showing "that his injury falls within the scope of the contract." *Pelkey v. Gen. Elec. Capital Assur. Co.*, 2002 ME 142, ¶ 10, 804 A.2d 385, 386. *Accord Boston Insurance Co. v. Dehydrating Process Co.*, 204 F.2d 441, 443 (1st Cir. 1953) (applying same rule under federal maritime law).

Under both Maine law and federal maritime law, after coverage is shown, Hanover bears the "burden of proving applicability of any policy exclusion." *Progressive Nw. Ins. Co. v. Metro. Prop. & Cas. Ins. Co.*, 2021 ME 54, ¶ 11, 261 A.3d 920, 923. *See also Chartis Prop. Cas. Co. v. Inganamort*, 953 F.3d 231, 234 (3d Cir. 2020) (applying same rule under federal maritime law); *Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine*

*Servs., Inc.*, 974 F. Supp. 2d 64, 81 (D.P.R. 2013) (same). However, federal courts applying maritime law have found that where an insurance policy's coverage is structured such that "the question of coverage turns on whether the event itself is fortuitous," then the matter of whether a ship's destruction was intentional goes to the scope of the policy's coverage and so properly remains the insured's burden. *Nw. Mut. Life Ins. Co. v. Linard*, 498 F.2d 556, 563 (2d Cir. 1974). *See also Chartis Prop. Cas. Co. v. Inganamort*, 953 F.3d 231, 234 (3d Cir. 2020) ("Every circuit to decide the issue has determined that the insured bears that burden [of proving a fortuitous loss], and we agree."). Though the insurer must respond to the insured's prima facie showing of a covered loss with evidence that the loss was intentionally caused, the insurer's burden is merely one of production. *Linard*, 498 F.2d at 562.

The policy at issue in this case covers losses stemming from "the adventures and perils . . . of the waters named herein, fire, lightning, earthquake, assailing thieves, jettisons, barratry of the master and mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel named herein." Compl. Ex. 1 at 2 (ECF No. 1-1). This language is nearly identical to the policy at issue in *Linard*.[6] There, the Second Circuit found that because "perils" are, by their nature, fortuitous events, whether the ship's destruction was intentional was an element of the policy's coverage. *Linard*, 498 F.2d at

---

[6] The policy at issue in *Linard* covered losses stemming from "the Adventures and Perils . . . of the Seas, Men-of-War, Fire, Lightning, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said Vessel, &c., or any part thereof; excepting, however, such of the foregoing Perils as may be excluded by provisions elsewhere in the Policy or by endorsement." *Northwestern Mutual*, 498 F.2d at 560 n.3.

563. I find this legal interpretation persuasive. Accordingly, Perry bears the ultimate burden of persuasion on the issue of whether the *ISLA & GRAYSON* was intentionally destroyed.

"The burden of demonstrating fortuity is not a particularly onerous one." *Morrison Grain Co. v. Utica Mut. Ins. Co.*, 632 F.2d 424, 430 (5th Cir. 1980). "Since the nature of a fortuitous loss is that it may not be easily explained, the insured need not point to an exact cause of the loss." *Chartis Prop. Cas. Co.*, 953 F.3d at 235. Instead, Perry need only persuade the court that it is more likely than not that the *ISLA & GRAYSON* burned for some reason other than a fire intentionally caused by Perry or at his direction.

"Every maritime contract imposes an obligation of good faith and fair dealing between the parties in its performance and enforcement." *Rocque v. Zetty*, LLC, 456 F. Supp. 3d 257, 262 (D. Me. 2020) (quoting *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1359 (S.D. Fla. 2007)). Indeed, the maritime doctrine of *uberrimae fidei* creates a reciprocal duty on all parties of a marine insurance contract to "accord one another the highest degree of good faith." *Windsor Mount Joy Mut. Ins. Co. v. Giragosian,* 57 F.3d 50, 54 (1st Cir. 1995). Thus, unlike parties in most contractual relationships, parties to a maritime insurance contract must "disclose all known facts or circumstances" to one another throughout their dealings. *QBE Seguros v. Morales-Vazquez*, 986 F.3d 1, 4 (1st Cir. 2021).

## ULTIMATE FINDINGS AND CONCLUSIONS

Although Hanover produced evidence that might cause a fact finder to infer that the loss of the *ISLA & GRAYSON* to fire was not a fortuitous event, I find it more likely than not that Perry had no hand in the destruction of his vessel and that the loss was fortuitous,

not intentional. Accordingly, on Perry's First Claim for Relief (breach of contract) and Fourth Claim of Relief (declaratory judgment) I find that Hanover is in breach of its contract of insurance and is liable to Perry for his loss. However, I also find that Hanover Insurance Company did not fail to disclose any material information to Perry or otherwise breach the duty of good faith and fair dealing associated with maritime insurance contracts; therefore, I find in favor of Hanover on Perry's First and Fourth Claim of Relief to the extent that those claims allege unfair treatment during the claims handling process. Finally, Plaintiff's Motion to Exclude Certain Opinion Testimony of J.P. Williamson (ECF No. 51) is denied as moot.[7]

**SO ORDERED.**

Dated this 9th day of August, 2022.

                                                  /s/ Lance E. Walker
                                                  UNITED STATES DISTRICT JUDGE

---

[7] At trial, counsel for Hanover avoided asking J.P. Williamson questions designed to elicit the opinions targeted in Perry's motion to exclude.